**ANGLO–DUTCH PETROLEUM INTERNATIONAL, INC. and Anglo–Dutch (Tenge) L.L.C., Appellants**

**v.**

**GREENBERG PEDEN, P.C. and Gerard J. Swonke, Appellees.**

No. 14–07–00343–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 26, 2008.

Gregory S. Coleman, Donald B. McFall, Richard B. Farrer, Austin, Kenneth R.

Breitbeil, Kenneth Wayne Bullock II, Houston, TX, for appellants

Rusty Hardin, Joe M. Roden, Ryan Kees Higgins, Houston, TX, for appellees.

Panel consists of Justices FOWLER and BOYCE and Senior Justice HUDSON.*

## OPINION

WILLIAM J. BOYCE, Justice.

Anglo–Dutch Petroleum International, Inc. and Anglo–Dutch (Tenge) L.L.C. (collectively, "Anglo–Dutch") appeal the trial court's judgment in favor of Greenberg Peden, P.C. and Gerard J. Swonke in connection with this fee dispute between a client and an attorney.

We affirm the trial court's judgment.

### Overview

This appeal arises from a contingency fee agreement dated October 16, 2000. It is undisputed that the client, Anglo–Dutch, entered the fee agreement. It is undisputed that Anglo–Dutch's president, Scott V. Van Dyke, signed the fee agreement on behalf of Anglo–Dutch. It is undisputed that the attorney, Swonke, also signed the fee agreement. It is hotly disputed whether Swonke signed the fee agreement on behalf of himself individually or on behalf of the Greenberg Peden law firm, where he was "of counsel" at the time.

Swonke contends he signed on behalf of himself individually and can recover fees individually. Anglo–Dutch contends Swonke signed on behalf of the law firm and cannot recover fees individually. Greenberg Peden disclaims rights to or interest in the disputed fees. The law firm assigned any interest under the October 16, 2000 fee agreement to Swonke; released Anglo–Dutch from liability to Greenberg Peden for the disputed fees; and acknowledged that Greenberg Peden is not entitled to receive money from Anglo–Dutch under the agreement.

The trial court concluded that the October 16, 2000 fee agreement is ambiguous with respect to the capacity in which Swonke signed, and submitted that issue to the jury. The jury sided with Swonke on that issue, finding that he signed the fee agreement with Anglo–Dutch on behalf of himself individually and not on behalf of Greenberg Peden. The jury further answered that Anglo–Dutch failed to comply with the fee agreement; that Swonke complied with his fiduciary duty to his client Anglo–Dutch; and that Van Dyke did not commit fraud against Swonke. The jury awarded $1 million as contract damages to Swonke for Anglo–Dutch's failure to comply with the fee agreement. The trial court signed a final judgment in conformity with the jury's findings awarding contract damages and additional statutory attorney's fees to Swonke. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (Vernon 2008).

Anglo–Dutch assails the trial court's final judgment in favor of Swonke on multiple grounds. Resolution of Anglo–Dutch's appellate challenges requires a detailed discussion of the evidence adduced at trial and the circumstances surrounding execution of the October 16, 2000 fee agreement.

### Facts

Swonke joined Greenberg Peden as "of counsel" in 1987.[1] This status gave Swonke discretion to choose his clients and

---

* Senior Justice J. Harvey Hudson sitting by assignment.

1. Swonke in fact joined a predecessor firm, which changed its name and composition from time to time. Because these changes do not affect the disposition of this appeal, we refer to "Greenberg Peden" throughout this opinion.

gave Greenberg Peden a right of first refusal regarding clients and matters Swonke brought to the firm. Swonke remained as "of counsel" to Greenberg Peden until the firm dissolved in 2001.

The "of counsel" relationship between Swonke and Greenberg Peden operated under a fee sharing agreement. For matters accepted by the firm, it billed Swonke's time through the firm computer system and deducted a percentage from Swonke's fees; the size of the deduction depended on the fee agreement with a particular client. This deduction reimbursed Greenberg Peden for Swonke's use of office space, paralegals, secretaries, and parking. Clients in matters accepted by the firm paid their fees for Swonke's time directly to Greenberg Peden, which made appropriate deductions and then paid the balance to Swonke.

Swonke met Van Dyke in 1987 at a lunch with Van Dyke's father while Van Dyke was working for his father's company. Van Dyke's father asked Swonke to perform legal work for the company. Swonke already had joined Greenberg Peden as of counsel at that point. While Van Dyke was still working for his father, Van Dyke and his father later asked about Swonke's salary at Greenberg Peden because they wanted to hire Swonke as in-house counsel for the father's company. Swonke responded that as "of counsel" he did not receive a salary from the firm, but was paid only when clients paid; Swonke explained that he generated his own work and sometimes made more money than at other times. Van Dyke, his father and Swonke decided to maintain their existing relationship, under which Swonke performed legal work for the father's company as "of counsel" at Greenberg Peden. Swonke testified that he also explained his "of counsel" status to Van Dyke and Van Dyke's mother on several occasions. Van

Dyke testified that he did not recall being told Swonke was "of counsel" to Greenberg Peden.

Van Dyke left his father's company in 1988 and together with his mother formed Anglo–Dutch Petroleum International, an oil and gas exploration company. Approximately four years later, Van Dyke asked Swonke to perform legal work for Anglo–Dutch in connection with development of oil and gas properties in an area known as the Tenge Field in Kazakhstan. Swonke began performing a substantial amount of legal work for Van Dyke and Anglo–Dutch in 1993. This work focused on preparing documents addressing the participation of multiple national and international investors in Anglo–Dutch's Tenge Field project. Swonke worked with Greenberg Peden shareholder Skip Naylor to draft the elaborate documents Van Dyke requested to bring investors together and create an entity called Anglo–Dutch (Tenge) L.L.C.

In 1997, Anglo–Dutch invited Halliburton Energy Services, Inc. and Ramco Oil & Gas, Ltd. to invest in the Tenge Field project. Anglo–Dutch hoped to use funds from these new investors to buy out its existing investors. To evaluate Anglo–Dutch's proposal, Halliburton and Ramco entered into confidentiality agreements with Anglo–Dutch and received confidential data to review. Swonke negotiated and drafted the confidentiality agreements for Anglo–Dutch.

Anglo–Dutch ceased paying Greenberg Peden's bills at about this time and began accumulating a large account payable to the firm. Anglo–Dutch's unpaid legal bills prompted Greenberg Peden to stop working for Anglo–Dutch in 1999. By early 2000, Anglo–Dutch owed Greenberg Peden more than $200,000. Swonke and Greenberg Peden shareholder David Peden met with Van Dyke in 1999 or early 2000 to discuss Anglo–Dutch's unpaid legal bills.

Peden told Van Dyke that no Greenberg Peden attorney would perform legal work for Anglo–Dutch until it paid its accumulated legal bills to the firm.

A dispute arose between Anglo–Dutch, Halliburton and Ramco in early 2000 regarding breach of the Tenge Field confidentiality agreements and disclosure of Anglo–Dutch's confidential data. Van Dyke asked Swonke in February 2000 to evaluate the potential for a lawsuit against Halliburton and Ramco for breach of the confidentiality agreements. Swonke advised Van Dyke that Anglo–Dutch had viable claims against both companies. Anglo–Dutch wanted to pursue the lawsuit but lacked financial resources to pay an attorney on an hourly basis.

Pursuant to Greenberg Peden's right of first refusal, Swonke asked the firm in February or March 2000 if it wanted to represent Anglo–Dutch in a suit against Halliburton and Ramco arising from breaches of the Tenge Field confidentiality agreements. Greenberg Peden refused to represent Anglo–Dutch on an hourly or a contingency basis because of Anglo–Dutch's unpaid bills and a history of difficulty in collecting fees from Anglo–Dutch. Thereafter, Swonke told Van Dyke that Greenberg Peden would not represent Anglo–Dutch in a lawsuit against Halliburton and Ramco due to Anglo–Dutch's outstanding legal bills. The bills remained unpaid.[2] Van Dyke did not ask Swonke to represent Anglo–Dutch against Halliburton and Ramco at that time.

Because Greenberg Peden refused to represent Anglo–Dutch in a suit against Halliburton and Ramco, Swonke referred Van Dyke to several other law firms. Anglo–Dutch signed a contingency fee agreement with McConn & Williams in March 2000. That firm filed a lawsuit against Halliburton and Ramco in May 2000. *See generally Ramco Oil & Gas Ltd. v. Anglo–Dutch (Tenge) L.L.C.,* 207 S.W.3d 801 (Tex.App.-Houston [14th Dist.] 2006, pet. denied).

Van Dyke and attorneys from McConn & Williams frequently asked Swonke for advice and help with tasks in furtherance of the lawsuit against Halliburton and Ramco in the months that followed this filing. After providing unpaid legal assistance for months, Swonke decided that he wanted compensation for time spent helping Anglo–Dutch with its lawsuit against Halliburton and Ramco. Swonke informed McConn & Williams of his desire to be paid. McConn & Williams said its fee interest was not large enough for that firm to compensate him out of its interest. Van Dyke then called Swonke directly; asked him to help with the lawsuit; and offered to pay him for doing so. Van Dyke and Swonke negotiated the terms of Swonke's compensation for his participation in Anglo–Dutch's suit against Halliburton and Ramco.

Van Dyke proposed to pay Swonke based on a contingency fee agreement because Anglo–Dutch could not afford an hourly fee. When Swonke suggested a flat percentage fee, Van Dyke responded by insisting on a formula that would (1) incorporate a ratio of hours Swonke spent to hours McConn & Williams attorneys spent, and then (2) multiply the 20 percent contingency fee contained in the McConn & Williams fee agreement by that ratio. Van Dyke thought this would be the only fair way to measure Swonke's hours. Swonke initially rejected Van Dyke's formula because he thought it was too complicated;

---

**2.** In June 2001, Anglo–Dutch signed a promissory note in favor of Greenberg Peden for $231,749.16. Anglo–Dutch paid the note with interest in December 2003, about two years after Greenberg Peden had dissolved.

later, he acquiesced to using it with a rounding feature.

Swonke's secretary typed the contingency fee agreement negotiated by Van Dyke and Swonke on Greenberg Peden letterhead; dated it October 16, 2000; and inserted the words "Greenberg Peden, P.C." in the signature block. The letter's opening paragraph states that it "memorializes our agreement with respect to me assisting you ... and the law firm of McConn & Williams, LLP" regarding the suit against Halliburton and Ramco. In the next paragraph, the letter states that "I agree to assist Anglo–Dutch and [McConn & Williams] ... in this lawsuit...."

Swonke signed the fee agreement's signature block on October 16, 2000 and sent it to Van Dyke for signature the same day. Van Dyke signed the fee agreement on October 17, 2000 and returned it to Swonke.

Van Dyke also sent a separate transmittal letter to Swonke on October 17, 2000 with a copy of the McConn & Williams contingency fee agreement. In the transmittal letter's second paragraph, Van Dyke states that the McConn & Williams fee agreement "provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch." The transmittal letter was stamped "received" by Greenberg Peden. At the time of receipt, Swonke did not respond to the transmittal letter; did not challenge its reference to a fee agreement "between Greenberg Peden P.C. and Anglo–Dutch;" and did not assert that the fee agreement was between Anglo–Dutch and Swonke individually. Swonke did not examine or respond to Van Dyke's letter at the time of receipt because the letter transmitted the McConn & Williams fee agreement that Swonke already had in his file. Swonke testified that he normally would not read a letter that refers to a document he already had in his files.

The Greenberg Peden firm dissolved on October 1, 2001. By that time, Swonke had worked 277 hours on Anglo–Dutch's suit against Halliburton and Ramco. Swonke joined McConn & Williams as "of counsel" in October 2001 and informed Anglo–Dutch that he was taking its files with him to McConn & Williams unless Anglo–Dutch objected. There was no objection. Under his contract with McConn & Williams, Swonke did not share in any McConn & Williams fees for working on the Anglo–Dutch lawsuit against Halliburton and Ramco. McConn & Williams understood that Swonke had a separate fee agreement with Anglo–Dutch in connection with the case. Swonke worked another 1,022 hours on Anglo–Dutch's lawsuit as "of counsel" to McConn & Williams.

Several months after Swonke left Greenberg Peden and joined McConn & Williams, Van Dyke was deposed in the Halliburton and Ramco lawsuit. At the deposition, Van Dyke testified that Anglo–Dutch had two contingency fee agreements. He testified that one such agreement was with John O'Quinn, Jett Williams, and Luke McConn, and the other was with Swonke. Van Dyke did not identify any contingency fee agreement with Greenberg Peden.

Anglo–Dutch's lawsuit against Halliburton and Ramco was tried for nine weeks beginning in August 2003. Anglo–Dutch sought more than $600 million in damages. *See Ramco Oil & Gas Ltd.*, 207 S.W.3d at 806–07. The jury found that Halliburton and Ramco breached their respective confidentiality agreements with Anglo–Dutch. The jury awarded Anglo–Dutch $64 million in lost profits for Halliburton's breach of its confidentiality agreement and $6.4 million in lost profits for Ramco's breach of its confidentiality agreement. The parties

stipulated to $9.8 million in reasonable and necessary attorney's fees, which included the 1,022 hours Swonke spent working on the lawsuit while at McConn & Williams.

Anglo–Dutch settled with Halliburton on April 1, 2004 for $51 million.[3] After Swonke learned of the settlement, he sent an e-mail to Van Dyke on April 7, 2004 reminding him that the October 16, 2000 fee agreement required a comparison of Swonke's hours to those billed by McConn & Williams. Swonke sent another e-mail to Van Dyke the same day setting forth the total number of hours he worked on the lawsuit. Swonke's email asserted his entitlement to three percent of the settlement amount according to Swonke's calculations. Van Dyke responded to Swonke's email on April 13, 2004. Van Dyke said he had lost his voice and agreed that he and Swonke needed to discuss Swonke's situation. Swonke replied, asking Van Dyke to call him when he felt well enough to speak and inquiring whether Van Dyke received a memorandum Swonke sent him providing examples of work Swonke performed in furtherance of the lawsuit. The record does not reflect a written response by Van Dyke to this inquiry.

The final Halliburton settlement documents were signed on April 15, 2004. At Van Dyke's request, Swonke's name was removed from the wiring instructions given to Halliburton. Swonke e-mailed Van Dyke that afternoon to note that Swonke's wiring instructions were not included with

those of other attorneys who had worked on the lawsuit. Swonke asked Van Dyke how he wanted to handle payment of Swonke's fees. In the meantime, attorneys at McConn & Williams asked Swonke to not force the fee issue with Van Dyke until after the settlement was funded and completed, fearing it could jeopardize the settlement.

On April 16, 2004, Swonke e-mailed Van Dyke to congratulate him on receiving a $30 million portion of the Halliburton settlement. Swonke asked Van Dyke to address payment of Swonke's fees. Swonke said he would fax to Van Dyke a release signed by Greenberg Peden, which Van Dyke had requested. In that document, the law firm assigned any interest under the October 16, 2000 fee agreement to Swonke and released Anglo–Dutch from liability to Greenberg Peden for fees under that agreement.

On April 19, 2004, attorneys Luke McConn and Edward Crain wrote letters to Van Dyke at Swonke's request in support of Swonke. Both stated that Swonke's assistance had been invaluable in prosecuting the suit against Halliburton, and that Swonke's submitted hours were fair and reasonable. Swonke also faxed a letter to Van Dyke on that date further explaining his hours and offering an audit of his hours. Van Dyke and Swonke set up a meeting for April 22, 2004 to discuss Swonke's fee request.

---

**3.** This settlement spawned a separate series of lawsuits and appeals involving investors who signed litigation funding agreements in return for a portion of Anglo–Dutch's recovery from the lawsuit against Halliburton and Ramco. After the jury returned its verdict against Halliburton and Ramco, Anglo–Dutch sought to reduce amounts it owed to investors who financed the lawsuit and a number of those investors sued Anglo–Dutch. *See Anglo–Dutch Petroleum Int'l, Inc. v. Smith,* 243 S.W.3d 776 (Tex.App.-Houston [14th Dist.] 2007, pet. filed); *Anglo–Dutch Petroleum Int'l, Inc. v. Littlemill Limited,* No. 14–06–00921–CV, 2007 WL 2826900 (Tex.App.-Houston [14th Dist.] Oct. 2, 2007, pet. filed); *Case Funding Network, L.P. v. Anglo–Dutch Petroleum Int'l, Inc.,* 264 S.W.3d 38 (Tex.App.-Houston [1st Dist.] 2007, pet. filed); *Anglo–Dutch Petroleum Int'l, Inc. v. Haskell,* 193 S.W.3d 87 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). Anglo–Dutch's judgment against Ramco was reversed on appeal. *See Ramco Oil & Gas Ltd.,* 207 S.W.3d at 827.

On April 20, 2004, Van Dyke met with attorney Sandy Dow to get a "fresh look" at Swonke's fee request. Swonke subsequently met with Van Dyke and his mother as scheduled at 8 a.m. on April 22, 2004. At the April 22 meeting, Van Dyke challenged the number of hours Swonke claimed to have worked on the lawsuit and the language of the Greenberg Peden release. Van Dyke asserted at this meeting that Anglo–Dutch entered the October 16, 2000 fee agreement with Greenberg Peden—not with Swonke individually. The meeting concluded without resolution of the fee dispute.

After meeting with Van Dyke, Swonke returned to his office and sent an email at 9:08 a.m. to Van Dyke and other recipients. The email stated that Swonke no longer would represent Van Dyke or his companies.

After meeting with Swonke, Van Dyke met with attorney Sandy Dow for about two hours. Dow's billing records for April 22, 2004 describe the activity at this meeting as follows: "Office conferences with Scott Van Dyke regarding claims of Gerard Swonke; Draft, review and revise Plaintiff's Original Petition." At 2:52 p.m. that day, Anglo–Dutch filed a suit against Swonke and Greenberg Peden seeking a declaratory judgment in connection with the October 16, 2000 fee agreement.

Anglo–Dutch asked for a declaration that the fee agreement is between Anglo–Dutch and Greenberg Peden. Anglo–Dutch also asserted that Swonke breached the fiduciary duties he owed as an attorney to client Anglo–Dutch, and requested fee forfeiture. Swonke later filed a counterclaim seeking a declaration that the fee agreement is between Anglo–Dutch and Swonke individually. Swonke also asserted claims for breach of contract against Anglo–Dutch, and for fraud against Anglo–Dutch and Van Dyke individually.

The jury returned a verdict after a two-week trial. In answer to Question 1, the jury found that the fee agreement with Anglo–Dutch was entered into on behalf of Swonke individually and not on behalf of Greenberg Peden. In answer to Question 2, the jury found that Anglo–Dutch failed to comply with the fee agreement. The jury awarded $1,000,000 to Swonke in Question 3 for his damages resulting from Anglo–Dutch's failure to comply with the fee agreement. The jury answered "yes" to Question 5 asking if Swonke complied with his fiduciary duty to Anglo–Dutch. The jury answered "no" to Question 9 asking if Van Dyke committed fraud against Swonke.[4]

The trial court signed a final judgment in conformity with the jury's verdict on January 22, 2007, ordering that Anglo–Dutch and Van Dyke take nothing from Swonke and Greenberg Peden; that Swonke and Greenberg Peden take nothing on their fraud and exemplary damages

---

4. The jury did not answer Question 4, asking what sum of money would compensate Greenberg Peden for its damages that resulted from Anglo–Dutch's failure to comply with the fee agreement, because it was conditioned on finding that the fee agreement was entered into on behalf of Greenberg Peden and not Swonke individually. The jury did not answer Question 6, asking the jury to determine the amount of Swonke's fees under the fee agreement, because Question 6 was conditioned on the jury answering Question 5 in the negative and not answering Question 3 with a dollar amount. Further, the jury did not answer Question 7, asking if clear and convincing evidence showed that Anglo–Dutch's harm resulted from malice or fraud, because it was conditioned on the jury answering Question 5 in the negative. Lastly, the jury did not answer Question 8, addressing exemplary damages against Swonke for the harm Anglo–Dutch suffered from Swonke's conduct, because it was conditioned on the jury answering Question 7 in the affirmative.

claims from Anglo–Dutch and Van Dyke; and that Anglo–Dutch pay Swonke $1,000,000 and prejudgment interest on that amount totaling $226,924.50. As agreed by the parties, the trial court held an evidentiary hearing on the issue of attorney's fees. The trial court ordered that Anglo–Dutch pay Swonke $352,892.50 in attorney's fees for the prosecution of his breach of contract claim and for defense of the declaratory judgment claims. Following denial of its post-trial motions, Anglo–Dutch timely filed a notice of appeal from the trial court's final judgment.

On appeal, the main dispute centers on whether Anglo–Dutch contracted with Greenberg Peden or with Swonke individually when Anglo–Dutch and Swonke signed the October 16, 2000 fee agreement. Anglo–Dutch approaches this issue from several angles, contending that (1) the fee agreement unambiguously is between Anglo–Dutch and Greenberg Peden, and should be construed that way as a matter of law; (2) any ambiguity in the fee agreement should be construed against the drafter, attorney Swonke; (3) the evidence is legally and factually insufficient to support the jury's finding that the fee agreement is between Anglo–Dutch and Swonke individually; and (4) the evidence is legally and factually insufficient to support the jury's finding that Swonke complied with his fiduciary duty. Anglo–Dutch also challenges the correctness of the trial court's jury charge and certain evidentiary rulings during trial.[5]

### Standards of Review

#### A. Contract Interpretation

■■■ Determining whether a contract is ambiguous is a question of law subject to *de novo* review on appeal. *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex.2008). To determine whether a contract is ambiguous, we look at the agreement as a whole in light of the circumstances present when the parties entered the agreement. *David J. Sacks, P.C. v. Haden*, No. 07–0472, 2008 WL 2702184, at *3 (Tex. July 11, 2008).

#### B. Legal and Factual Sufficiency of the Evidence

We apply the standard and scope of review for legal sufficiency of the evidence discussed in *City of Keller v. Wilson*, 168 S.W.3d 802 (Tex.2005). After *City of Keller*, it is difficult to make general pronouncements about the scope of review for a legal sufficiency challenge. The better course is to focus on the specific type of legal sufficiency challenge that is being made; this, in turn, frames the scope of review for appeal.

*City of Keller* endorsed Chief Justice Calvert's description of legal sufficiency challenges. "No-evidence" challenges may be sustained only when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810 (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence Points of Error,"* 38 Tex. L.Rev. 361, 362–63 (1960)).

---

**5.** Anglo–Dutch does not challenge on appeal the jury's finding that it breached the fee agreement; the amount of contract damages awarded for that breach; or the separate statutory fee award for litigating Swonke's contract claim under the disputed fee agreement, which the parties opted to try to the court. Anglo–Dutch also does not challenge the rendition of a take-nothing judgment in favor of Greenberg Peden.

We must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822. If the evidence allows only one inference, neither jurors nor the reviewing court may disregard that evidence. *Id.* "The traditional scope of review does not disregard contrary evidence in every no evidence review if there is no favorable evidence (situation (a) above), or if contrary evidence renders supporting evidence incompetent (situation (b) above) or conclusively establishes the opposite (situation (d) above)." *Id.* at 810–11. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *Id.* at 822. Accordingly, the ultimate test for legal sufficiency always must focus on whether the evidence would enable reasonable and fair-minded jurors to reach the verdict under review. *Id.* at 827. Legal sufficiency review in the proper light must credit favorable evidence if reasonable jurors could do so, and must disregard contrary evidence unless reasonable jurors could not do so. *Id.* The reviewing court cannot substitute its judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement. *Id.* at 822.

In reviewing factual sufficiency, we must consider and weigh all the evidence. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex.2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.*

For both legal and factual sufficiency review, the jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *City of*

*Keller*, 168 S.W.3d at 819; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

## C. Charge Instructions

 We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 456 (Tex.2006). A party is entitled to a jury question, instruction, or definition on an issue raised by the pleadings and evidence. Tex.R. Civ. P. 278; *Dew*, 208 S.W.3d at 456. The trial court enjoys wide discretion in framing a jury charge and is given broad latitude to determine the propriety of explanatory instructions and definitions. *H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22, 23 (Tex. 1998). A trial court's error in refusing an instruction is reversible if that refusal probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1; *Dew*, 208 S.W.3d at 456.

## D. Admission of Evidence

 We review a trial court's decision to admit or exclude evidence for abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex.2005). A trial court abuses its discretion in admitting or excluding evidence if it acts without reference to any guiding rules and principles, or if the act complained of is arbitrary and unreasonable. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex.2002). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). We will not reverse a trial court for an erroneous evidentiary ruling unless the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex. R.App. P. 44.1; *see also Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396

(Tex.1989). A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex.1995).

## Analysis

### A. The Fee Agreement is Ambiguous

■ Anglo–Dutch first argues that the trial court erred by allowing the jury to interpret the fee agreement because it unambiguously is between Anglo–Dutch and Greenberg Peden—not between Anglo–Dutch and Swonke individually. We reject Anglo–Dutch's contention because we agree with the trial court's determination that the fee agreement is ambiguous with respect to whether Swonke contracted for himself individually or for Greenberg Peden.

■ Our primary concern when interpreting a contract is to ascertain and give effect to the intent of the parties as that intent is expressed in the contract. *Perry Homes v. Cull*, 258 S.W.3d 580, 606 (Tex.2008). The contract's language is the primary evidence of that intent. *Id.* We examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006).

■ To determine whether a contract is ambiguous, we look at the agreement as a whole in light of the circumstances present when the parties entered into the agreement. *David J. Sacks, P.C.*, 2008 WL 2702184, at *3 (contract for legal services was not ambiguous and unenforceable as written because it only could be reasonably interpreted as setting forth agreement that client agreed to pay law firm hourly fee and contained no cap on

fees); *Enter. Leasing Co. v. Barrios*, 156 S.W.3d 547, 549 (Tex.2004). A contract is unambiguous if it can be given a definite or certain meaning. *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).

■ If the contract is subject to two or more reasonable interpretations, then the contract is ambiguous and the jury is entitled to resolve the fact issue concerning the parties' intent. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003); *Columbia Gas Trans. Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). An ambiguity can be patent or latent. *E.g., Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 n. 1 (Tex.1996). A patent ambiguity is evident on the contract's face. *Id.* at 282. A latent ambiguity arises from a collateral matter when a contract that appears to be unambiguous on its face is applied to its subject. *Id.* at 282–283.

We begin with the October 16, 2000 fee agreement, which reads in its entirety as follows:

Dear Scott:

This letter memorializes our agreement with respect to me assisting you and/or the companies which you control (Anglo–Dutch) and the law firm of McConn & Williams, LLP regarding the above-reference matter.

In that regard, you have executed a Fee Agreement with the law firm of McConn & Williams on March 25, 2000, which is incorporated herein by reference. I agree to assist Anglo–Dutch and that firm in this lawsuit for proportionately the same percentage (20%) of any benefit to McConn & Williams reflected in such agreement. However, I will not be responsible for any expenses other than those I may personally incur. Further, the proportions under which my fees

shall be calculated will be the ratio of the hours I have spent or will spend on this matter relative to the hours the attorneys at McConn & Williams have spent or will spend after the date the lawsuit was filed, rounded to the next whole percentage. For example, if McConn & Williams' attorneys spend 1,000 hours on the lawsuit after the date the lawsuit was filed and I spend 90 hours of my time towards the lawsuit, then by rounding up to nearest whole number, I would be entitled to receive from you 2% (10% of 20%) of the gross revenues and other benefits recovered, if any, from this lawsuit. In addition, should the Fee Agreement be amended, you agree that I shall be entitled to the benefit of such amendment.

If this comports with your understanding of our agreement, please indicate by signing below and returning this letter to me.

If you have any questions, please contact me.

> Very truly yours,
> GREENBERG PEDEN P.C.
> /s/
> GERARD J. SWONKE

Anglo–Dutch contends the fee agreement is an unambiguous contract between Greenberg Peden and Anglo–Dutch, stressing that it is printed on Greenberg Peden letterhead. Swonke's address, telephone and fax number are not included. Swonke signed under the "Greenberg Peden P.C." signature block.

For his part, Swonke stresses that the agreement's text does not reference Greenberg Peden. The fee agreement refers five times to McConn & Williams by name but never says Greenberg Peden will perform legal services for Anglo–Dutch. Swonke also highlights multiple references to himself individually. The letter refers to "our agreement with respect to me as-sisting you and/or the companies which you control (Anglo–Dutch)." It continues with "I agree to assist," "I will," "I may," "my fees," "I have spent," "I spend 90 hours of my time … I would be entitled to receive from you," "I shall be entitled," and concludes with "If this comports with your understanding of our agreement."

The circumstances surrounding formation of the fee agreement also bear on this issue. *See Enter. Leasing Co.*, 156 S.W.3d at 549. Anglo–Dutch points to the following circumstances: (1) Anglo–Dutch had a longstanding relationship with Greenberg Peden; (2) the personal pronouns used throughout the fee agreement are consistent with hiring Greenberg Peden while specifying which Greenberg Peden attorney would perform the work; and (3) Van Dyke's October 17, 2000 transmittal letter demonstrates his belief that the fee agreement was between Anglo–Dutch and Greenberg Peden.

Swonke emphasizes other circumstances surrounding execution of the fee agreement. The fee agreement was signed against a backdrop that included (1) previous explanations dating back at least a decade regarding the nature of Swonke's "of counsel" status at Greenberg Peden; (2) Greenberg Peden's refusal to perform work for Anglo–Dutch since 1999 due to unpaid legal bills; and (3) Greenberg Peden's specific refusal to represent Anglo–Dutch on an hourly or a contingency fee basis in its suit against Halliburton and Ramco, again due to unpaid legal bills. Van Dyke acknowledged that after 1999, no Greenberg Peden attorney had performed legal work for Anglo–Dutch. Van Dyke admitted that Swonke informed him of the firm's refusal to represent Anglo–Dutch in the lawsuit against Halliburton and Ramco due to Anglo–Dutch's unpaid legal bills.

We reject Anglo–Dutch's contention that the October 16, 2000 letter agreement unambiguously establishes a contract between Anglo–Dutch and Greenberg Peden in light of the letter's content and the circumstances surrounding its execution. The use of Greenberg Peden letterhead and the inclusion of "Greenberg Peden P.C." in the signature block reasonably suggest a contract with the law firm rather than an individual attorney. But the absence of any reference to Greenberg Peden in the letter's body—combined with Swonke's exclusive use of personal pronouns in the letter after the law firm repeatedly and emphatically told Van Dyke it would not represent Anglo–Dutch—reasonably suggest a contract with Swonke individually. These circumstances render the fee agreement ambiguous and give rise to a fact issue. The trial court properly submitted that fact issue to the jury for resolution.

This conclusion should not be misconstrued as a holding that any appearance of personal pronouns in an engagement letter or fee agreement creates ambiguity about whether the client hired a law firm or an individual lawyer. It usually will be clear when a client hired a law firm with an expectation that particular lawyers at the firm would work on a particular matter. However, an ambiguity exists in this case due to conflicting indications on the fee agreement's face combined with the law firm's prior express refusals to represent Anglo–Dutch, which refusals were communicated directly to Van Dyke. Regardless of whether the ambiguity is characterized as "patent" or "latent," an ambiguity exists.

Anglo–Dutch cannot change this conclusion by pointing to the October 17, 2000 transmittal letter Van Dyke sent to Swonke. As noted earlier, the transmittal letter states as follows: "This fee agreement with McConn & Williams, LLP provides the basis for the Agreement between Greenberg Peden P.C. and Anglo–Dutch." Even assuming for argument's sake that a separate letter signed **after** execution of the fee agreement can be considered as part of the circumstances existing **when** the fee agreement was executed, the transmittal letter merely underscores the existence of an ambiguity in the fee agreement.

After examining the fee agreement as a whole and the circumstances present when the parties signed it, we hold that the fee agreement is ambiguous and that the trial court properly submitted a question asking the jury to determine the identity of the contracting parties.

We overrule Anglo–Dutch's first issue.

## B. Determining Which Parties Entered the Ambiguous Fee Agreement

Anglo–Dutch next argues that the trial court should have construed the fee agreement against Swonke because (1) any ambiguities in attorney-drafted fee agreements should be construed strictly against the attorney-drafter; and (2) there is legally and factually insufficient evidence to support the jury's finding that Swonke is a party to the fee agreement and Greenberg Peden is not.

The fact finder usually is tasked with weighing evidence of the parties' intent and choosing among competing interpretations of an ambiguous contract. *See Columbia Gas Transmission Corp.*, 940 S.W.2d at 589. However, ambiguities sometimes are construed in favor of one contracting party over another to address disparities in negotiating power or to promote public policy goals. *See, e.g., Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex.2006) (if an exclusion in an insurance contract has more than one reasonable

interpretation, it will be construed in favor of the insured).

Anglo–Dutch acknowledges that Texas has not adopted a blanket rule construing all ambiguities in contingency fee agreements against the attorney and in favor of the client. Anglo–Dutch nevertheless invites this court to construe the ambiguous October 16, 2000 fee agreement against Swonke.

**1. Should the ambiguous fee agreement be construed against Swonke?**

**a. *Contra proferentem***

Anglo–Dutch invokes the doctrine of *contra proferentem* to advocate strict construction of the fee agreement against Swonke. Under this doctrine, an ambiguous contract will be interpreted against its drafter. *See, e.g., Evergreen Nat'l Indem. Co. v. Tan It All, Inc.,* 111 S.W.3d 669, 677 (Tex.App.-Austin 2003, no pet.) (if insured's interpretation of ambiguous policy provision is reasonable, it will be adopted even if insurer's interpretation is objectively more sensible, as long as insured's construction is not unreasonable). Courts employ this doctrine as a device of last resort when construing ambiguous contracts; it essentially operates as a tie-breaking device to prevent arbitrary decisions. *Id.*

Anglo–Dutch acknowledges that Texas case law has not applied this doctrine in blanket fashion to all ambiguities in attorney-client fee agreements. Anglo–Dutch nonetheless argues that recent Texas Supreme Court decisions suggest a preference for strictly construing ambiguities in fee contracts against the attorney and in favor of the client. We analyze the cases cited by Anglo–Dutch in light of its assertion.

In *Hoover Slovacek LLP v. Walton,* 206 S.W.3d 557, 559 (Tex.2006), Walton hired attorney Parrott of Hoover Slovacek to recover royalties from oil and gas companies operating on his ranch. Under the fee agreement, Hoover Slovacek was entitled to a 30 percent contingent fee for all claims on which collection was achieved. *Id.* The fee agreement also included a provision stating that, in the event the firm was discharged before completing the representation, Walton immediately had to pay a fee equal to the present value of the firm's interest in Walton's claim. *Id.*

Parrott negotiated settlements with Texaco and El Paso Natural Gas, and Walton paid the firm its contingent fee. Parrott then turned to Walton's claims against Bass Enterprises Production Company, and Walton authorized Parrott to settle for $8.5 million. *Id.* Parrott's initial settlement demand was for $58.5 million. A month later, Bass offered $6 million not only to settle Walton's claims, but also to acquire surface estates of eight sections of Walton's ranch. *Id.* Walton refused to sell, authorized Parrott to settle Walton's claims for unpaid royalties for $6 million, and expressed his discontent with Parrott for not consulting Walton before making the $58.5 million settlement demand. *Id.* at 559–60. When Parrott responded by urging Walton to sell part of his ranch, Walton discharged Parrott and hired Andrews & Kurth LLP. *Id.* at 560. That firm settled Walton's claims against Bass for $900,000. *Id.* In the meantime, Hoover Slovacek demanded that Walton pay $1.7 million under the fee agreement. Hoover Slovacek contended that Bass's $6 million offer and Walton's subsequent authorization to settle for that amount established the present value of Walton's claims at the time of discharge. *Id.*

The court examined whether the termination fee provision was contrary to public policy. *Id.* at 561–66. It concluded that the firm's provision penalized Walton for changing counsel; granted the firm an

impermissible proprietary interest in Walton's claims; shifted the risks of representation almost entirely to Walton's detriment; and subverted several policies underlying the use of contingent fees. *Id.* at 566. Thus, the court determined that it was unenforceable because it was unconscionable as a matter of law, severed the termination provision, and held the remainder of the fee agreement was enforceable. *Id.*

In *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 859 (Tex.2000), the Lopezes hired Munoz, Hockema & Reed to represent them in a wrongful death suit against Westinghouse Electric Corporation. Their contingency fee agreement assigned 40 percent of any recovery to the firm, and 45 percent if the case "is appealed to a higher court." *Id.* After a $25 million jury verdict in favor of the Lopezes, the parties began settlement negotiations. *Id.* The parties tentatively agreed to a settlement, but Westinghouse filed a cash deposit in lieu of a cost bond with the trial court to perfect an appeal in case the settlement fell through. *Id.* When the firm met with the Lopezes to discuss the settlement and the firm's fees, the firm explained that its fee would be 45 percent of the recovery. No one objected at the time. *Id.* at 859–60. The Lopezes signed a settlement statement reflecting the firm's 45 percent fee and the funds were distributed. *Id.* at 860.

Three years later, the Lopezes sent the firm a letter asking the firm to refund the additional five percent fee. *Id.* When the firm refused, the Lopezes sued the firm alleging a breach of contract claim. *Id.* They argued that the phrase "appealed to a higher court" was ambiguous and should be construed against its drafter, the firm. *Id.* However, the court held that the contract language is unambiguous because it can be given a definite legal meaning and it is not reasonably susceptible to more than one meaning. *Id.* at 861. By filing a cash deposit to perfect an appeal, the court found that an appeal had been "taken" and the appellate court's jurisdiction had been invoked under a plain reading of the appellate rules. *Id.* The court concluded that the unambiguous contract would be enforced as written. *Id.* at 862. Accordingly, because the case was appealed to a higher court when Westinghouse perfected its appeal, the firm did not breach the contract by charging the additional appeal fee. *Id.*

Justice Gonzales dissented in *Lopez* and argued that the phrase "appealed to a higher court" is ambiguous and should have been construed against the attorneys. *Id.* at 865. Justice Gonzales acknowledged that, when the objective meaning of a contract term is ambiguous, the parties' subjective meaning of the term becomes a fact question. *Id.* Nonetheless, he advocated that the special relationship between an attorney and client as well as the attorney's superior understanding of contract terms generally require an ambiguous contract to be construed against the attorney-drafter. *Id.* at 866.

Finally, in *Levine v. Bayne, Snell & Krause, Ltd.,* 40 S.W.3d 92, 93 (Tex.2001), the Levines agreed to pay their attorneys "one-third of any amount received by settlement or recovery from their lawsuit" for foundation damage. The Levines' $243,644 award was offset to extinguish their mortgage obligation, giving them clear title and resulting in a net recovery of $81,792.62. *Id.* A dispute arose regarding computation of fees before or after the offset. *Id.* The court sided with the Levines and held that "any amount received" meant net recovery. *Id.* at 95. The court reasoned that, because the attorney is better able to predict and provide for fee arrangements, the burden should

fall on the attorney to express in the agreement with the client whether the contingent fee will be calculated on non-cash benefits as well as money damages. *Id.* In *Levine,* there was no contract ambiguity and the court did not discuss or apply the doctrine of *contra proferentem.*

These cases do not establish that Texas law requires an ambiguity concerning the identity of parties to a fee agreement to be resolved against the attorney.

*Hoover Slovacek* does not apply here because it addresses whether a fee agreement's termination provision is unconscionable and unenforceable. *Hoover Slovacek,* 206 S.W.3d at 559. It did not decide whether *contra proferentem* should be applied to construe an ambiguous fee agreement against the attorney-drafter.

In *Lopez,* Justice Gonzalez argued in dissent that the fee agreement was ambiguous and should be construed against the attorney-drafter because of the special relationship between attorney and client. *Lopez,* 22 S.W.3d at 866. No subsequent Texas Supreme Court case has acted on the *Lopez* dissent's urging to adopt a broad *contra proferentem* rule for attorney-client fee contracts.

*Levine* placed a burden on attorneys to express clearly the contemplated computation in fee agreements. 40 S.W.3d at 95. That decision did not address an ambiguity concerning the identity of parties to a fee agreement, and it did not adopt a *contra proferentem* rule for all ambiguities in all attorney-client fee agreements.

Given the absence of definitive teaching from the Texas Supreme Court, we look for guidance on this issue from comment h to section 18 of the RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS. Both sides invoke comment h in favor of their respective positions. Comment h provides in pertinent part:

Construction of client-lawyer contracts. Under this Section, contracts between clients and lawyers are to be construed from the standpoint of a reasonable person in the client's circumstances. The lawyer thus bears the burden of ensuring that the contract states any terms diverging from a reasonable client's expectations. The principle applies to fee terms ... as well as other terms.

* * *

Many tribunals have expressed the principle as a rule that ambiguities in client-lawyer contracts should be resolved against lawyers. That formulation can be taken to mean that the principle comes into play only when other means of interpreting the contract have been unsuccessful. Under this Section, the principle that the contract is construed as a reasonable client would understand it governs the construction of the contract in the first instance. However, this Section does not preclude reliance on the usual resources of contractual interpretation such as the language of the contract, the circumstances in which it was made, and the client's sophistication and experience in retaining and compensating lawyers or lack thereof. The contract is to be construed in light of the circumstances in which it was made, the parties' past practice and contracts, and whether it was truly negotiated. When the reasons supporting the principle are inapplicable—for example, because the client had help of its own inside counsel or another lawyer in drafting the contract—the principle should be correspondingly relaxed.

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 18 cmt. h (1998). Comment h identifies multiple factors that may influence interpretation of an ambiguous attor-

ney-client agreement, and it guides our disposition here.

■ Comment h does not mandate that ambiguities in attorney-client contracts always must be construed against the attorney. Rather, comment h contemplates reliance on the customary resources used for contract interpretation, including consideration of the contract language and surrounding circumstances; the client's sophistication and experience; the parties' past practice; and whether the contract terms were truly negotiated or instead were imposed unilaterally. This approach encompasses multiple factors and encourages sensitivity to the particular circumstances of a particular case. Comment h ultimately grounds the analysis on this question: What would "a reasonable person in the client's circumstances" understand or expect?

The "client's circumstances" in this case do not involve an unsophisticated individual whose lawyer presented an already-drafted agreement on a take-it-or-leave-it basis. To the contrary, this case involves a sophisticated and experienced client who vigorously negotiated the fee agreement with an individual attorney after being told the law firm would not take the case. The evidence in this case establishes that (1) Van Dyke is an experienced businessman who had been instrumental in drafting complex contracts and setting up complex business ventures with national and international investors; (2) the fee agreement was created through a collaborative process between Van Dyke and Swonke; (3) the fee agreement's terms were vigorously negotiated; (4) all provisions Van Dyke insisted upon were included in the contract; (5) Van Dyke had experience in retaining attorneys; (6) Greenberg Peden previously told Van Dyke it no longer would represent Anglo–Dutch due to unpaid legal bills; and (7) Swonke told Van Dyke that Greenberg Peden specifically refused to represent Anglo–Dutch in the lawsuit against Halliburton and Ramco.

These circumstances make the present case an inappropriate vehicle for applying the doctrine of *contra proferentem*—either broadly with respect to all ambiguities that may arise in connection with attorney-client agreements, or specifically with respect to the particular ambiguity at issue here regarding the identity of Anglo–Dutch's contracting counterpart. Construing the October 16, 2000 fee agreement from the standpoint of a reasonable client in the circumstances of Anglo–Dutch's Van Dyke, there is ample basis for concluding that such a client would understand Anglo–Dutch had contracted with an individual lawyer rather than the law firm. At a minimum, a triable issue of fact is presented regarding the parties' intent.

### b. Breach of fiduciary duty

Anglo–Dutch tries to bolster its argument for applying *contra proferentem* by linking that doctrine to Swonke's asserted breach of his fiduciary duty.

Anglo–Dutch argues that the ambiguous fee agreement should be construed against Swonke because he breached his fiduciary duty. Anglo–Dutch contends that Swonke breached his fiduciary duty by mistakenly drafting an ambiguous fee agreement and then failing to disclose to Van Dyke his own interpretation of that agreement as an individual contract, which diverged from Van Dyke's stated belief that Anglo–Dutch contracted with Greenberg Peden rather than Swonke individually.

■ Anglo–Dutch's argument is hampered by the jury's finding that Swonke complied with his fiduciary duty. Anglo–Dutch's linkage of *contra proferentem* and Swonke's asserted breach of fiduciary duty makes it appropriate at this juncture to address Anglo–Dutch's contention that le-

gally and factually insufficient evidence supports the jury's finding in favor of Swonke on this issue.

Jury Question 5 asked:

Did Swonke comply with his fiduciary duty to Anglo–Dutch?

As Anglo–Dutch's attorney, Swonke owed Anglo–Dutch a fiduciary duty. To prove that he complied with his fiduciary duty, Swonke must show:

A. The transactions in question were fair and equitable to Anglo–Dutch;

B. Swonke made reasonable use of the confidence that Anglo–Dutch placed in him;

C. Swonke acted in the utmost good faith and exercised the most scrupulous honesty toward Anglo–Dutch;

D. Swonke placed the interests of Anglo–Dutch before his own, did not use the advantage of his position to gain any benefit for himself at the expense of Anglo–Dutch, and did not place himself in any position where his self-interest might conflict with his obligations as a fiduciary; and

E. Swonke fully and fairly disclosed all important information to Anglo–Dutch concerning the transactions.

Answer "YES" or "NO":

Answer: YES

It is worth noting that the jury did not answer "no" to a question asking whether Swonke breached his fiduciary duty. In other words, the jury's answer is not merely a failure to find actionable conduct in answer to a question that put the burden of proof on Anglo–Dutch. *Cf. Blizzard v. Nationwide Mut. Fire Ins. Co.*, 756 S.W.2d 801, 806 (Tex.App.-Dallas 1988, no writ) ("the jury's negative answer does not establish the contrary of the question asked;" it establishes only that the party with the burden of proof failed to meet that burden). Rather, the jury here an-swered "yes" to a question that put the burden of proof on Swonke. It is an affirmative finding in Swonke's favor establishing that he complied with all facets of his fiduciary duty to Anglo–Dutch—including his duty to "fully and fairly disclose[ ] ... all important information to Anglo–Dutch concerning the transactions."

We conclude that the evidence is legally and factually sufficient to support the jury's "yes" answer to Question 5.

Anglo–Dutch asserts that it conclusively established Swonke's breach of fiduciary duty because the evidence is undisputed that Swonke failed to (1) clarify the nature of the fee agreement when the parties signed it, or explain his view of the terms governing his entitlement to a fee; (2) respond to Van Dyke's October 17, 2000 transmittal letter, which set forth Van Dyke's divergent view of the fee agreement's meaning; (3) inform Anglo–Dutch about his interpretation of the fee agreement after he left Greenberg Peden and about the repercussions his move would have; (4) inform Anglo–Dutch of a conflict of interest Swonke created when he began working at McConn & Williams while considering himself to be exempt from the fee agreement Anglo–Dutch had with McConn & Williams; (5) consult with Anglo–Dutch regarding the assignment of rights he negotiated with Greenberg Peden at the time he negotiated the release; and (6) act with the strictest fairness and honesty with respect to his fee because he sought to recover a fee five times the amount Anglo–Dutch reasonably expected to pay.

As stated above, when conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. We will credit favorable evidence if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could

not do so. *City of Keller*, 168 S.W.3d at 822, 827. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to decide the issue. *Id.* at 822. Under the governing standard and scope of review, we consider the following evidence in assessing Anglo–Dutch's contention that the evidence was undisputed and conclusively established Swonke's breach of fiduciary duty.

Swonke testified that he explained his "of counsel" status to Van Dyke on several occasions, although Van Dyke claimed to have no recollection of these explanations. Swonke testified—and Van Dyke acknowledged—that Greenberg Peden refused to represent Anglo–Dutch in the lawsuit against Halliburton and Ramco because of unpaid legal fees. Swonke testified—and Van Dyke acknowledged—that Swonke continued to provide services in furtherance of the lawsuit after Swonke referred Anglo–Dutch to McConn & Williams without receiving compensation from Anglo–Dutch. Swonke testified—and Van Dyke acknowledged—that Van Dyke approached Swonke asking for Swonke's help.

Van Dyke proposed a contingency fee agreement. Swonke testified that he wanted a flat fee, but Van Dyke insisted on computing the fee based on the hourly formula stated in the fee agreement. After negotiations, Swonke acquiesced to Van Dyke's formula but added a rounding-up feature. Swonke testified that he and Van Dyke discussed the rounding feature, and that Van Dyke understood it. Van Dyke testified that he recommended the fee agreement be based on the hourly formula and that Swonke proposed the rounding-up feature.

According to Swonke, the parties achieved a meeting of the minds when they entered the fee agreement after Van Dyke specifically called Swonke and requested his personal services. Swonke testified that Van Dyke knew the fee agreement was Swonke's personal contract with Anglo–Dutch; knew that no one at Greenberg Peden would do any more work for Anglo–Dutch; and knew that no one at Greenberg Peden had done any work for Anglo–Dutch since 1999. Swonke testified that Van Dyke absolutely and without a doubt understood that Swonke would be paid individually when he moved to McConn & Williams; Anglo–Dutch had been with Swonke for 15 years and Greenberg Peden had severed ties with Anglo–Dutch earlier. Further, when Swonke joined McConn & Williams as "of counsel," he sent Van Dyke a letter informing Van Dyke of his move and his intent to take the clients' files to McConn & Williams absent objections. Van Dyke did not object to Swonke taking Anglo–Dutch's files with him to McConn & Williams.

Swonke also testified that he complied with his fiduciary duty to Anglo–Dutch. Swonke stated that he (1) was perfectly honest with Van Dyke about any fee arrangements; (2) did not engage in any self-dealing; (3) did not do anything concerning the fee agreement that was to his advantage but to Anglo–Dutch's disadvantage; (4) never received any benefit for the work he performed on behalf of Anglo–Dutch in the lawsuit; (5) acted with absolute candor and honesty, and without any concealment or deception toward Anglo–Dutch; (6) provided Anglo–Dutch his undivided loyalty; (7) never failed to inform Van Dyke of matters material to the representation; and (8) never believed there was a conflict of interest in this case.

This evidence entitled the jury to conclude that the transaction was fair and equitable to Anglo–Dutch, and that Swonke fully and fairly disclosed all important information regarding the terms of the fee agreement. The jury was entitled

to conclude that Van Dyke knew the fee agreement was between Anglo–Dutch and Swonke individually, and that no further disclosure was necessary. Further, the testimony entitled the jury to find that Swonke acted with fairness, loyalty, and honesty toward his client Anglo–Dutch, and that he did not create any conflict of interest when he moved to McConn & Williams; his move had no effect on the parties' relationship because the fee agreement was between Anglo–Dutch and Swonke individually, and would follow him wherever he chose to practice as of counsel.

Additionally, Swonke testified that he did not respond to Van Dyke's October 17, 2000 transmittal letter because he did not see it. Swonke testified that he normally would not read a letter that refers to a document he already had in his files. Swonke stated that he would have responded to the letter if he had seen it and had thought Van Dyke was contending the fee agreement was with Greenberg Peden. Swonke testified that Van Dyke's assertion of a fee agreement between Greenberg Peden and Anglo–Dutch was suspicious because both knew that the fee agreement was between Anglo–Dutch and Swonke individually. According to Swonke, it is not possible that Van Dyke was simply expressing his belief in the transmittal letter because Van Dyke had continued calling Swonke for help with the Halliburton lawsuit. When Swonke became tired of helping Van Dyke without compensation, Van Dyke asked Swonke for help and proposed the fee agreement without anyone at Greenberg Peden knowing about it.

This evidence entitled the jury to conclude that Swonke never saw the October 17, 2000 letter and, therefore, did not have to take further steps to disclose information to Anglo–Dutch regarding its contracting counterpart.

Swonke also testified that when he told Van Dyke he wanted to be included on the settlement distribution list, Van Dyke asked Swonke to obtain a release from Greenberg Peden. According to Swonke, Van Dyke insisted that Swonke get a release to prevent the law firm from making a claim against Anglo–Dutch because the fee agreement was printed on Greenberg Peden letterhead. Swonke drafted a release and assignment to address Van Dyke's request. Swonke explained that he was acting as Anglo–Dutch's attorney and was trying to draft exactly what Van Dyke requested. Swonke testified that there was nothing in the release document to cause concern to an attorney representing Anglo–Dutch.

This evidence entitled the jury to conclude that Swonke obtained the Assignment and Release Agreement at Van Dyke's insistence; that Swonke made reasonable use of the confidence Anglo–Dutch placed in him; that he acted in the utmost good faith; and that he did not use the advantage of his position to gain any benefit for himself at the expense of Anglo–Dutch.

Having reviewed the evidence and considered that the jury is the sole judge of the credibility of the witnesses, we conclude that the evidence is legally sufficient because it would enable reasonable and fair-minded people to find that Swonke complied with his fiduciary duty to Anglo–Dutch.

Alternatively, Anglo–Dutch argues that the evidence in this case is factually insufficient to support the jury's finding that Swonke complied with his fiduciary duty.

In addition to the evidence discussed above, Anglo–Dutch relied on testimony from a fiduciary duty expert, Robert Schuwerk. He testified that Swonke had a duty to clarify who the contracting parties

were because the fee agreement was on Greenberg Peden letterhead and contained the firm's signature block. Schuwerk opined that Swonke owed a fiduciary duty to clear up any misunderstanding regarding who the contracting parties were—if he received the October 17, 2000 transmittal letter from Van Dyke. Schuwerk could not point to any case or treatise establishing that an attorney breaches his fiduciary duty by not acting on a document he never saw or read. Schuwerk declined to opine on whether Swonke breached his fiduciary duty if he had not seen or read the October 17, 2000 transmittal letter.

Schuwerk also testified that Swonke owed a duty to write a new contract when he left Greenberg Peden for McConn & Williams, and to explain how the move might affect Anglo–Dutch's obligation to pay legal fees. He opined that Swonke should have redone the fee agreement even if Swonke and Van Dyke both knew the fee agreement was an individual contract. Swonke testified that it would have been "ludicrous" to redo the fee agreement because it was Swonke's individual agreement.

Having reviewed all the evidence before us and considered that the jury is the sole judge of the credibility of the witnesses, we conclude that the jury's "yes" answer to Question 5 was supported by factually sufficient evidence. Accordingly, we conclude that the evidence was legally and factually sufficient to support the jury's finding that Swonke complied with his fiduciary duty.

In light of the jury's amply supported answer to Question 5, we reject Anglo–Dutch's argument that Swonke's asserted breach of fiduciary duty justifies applying *contra proferentem* and construing the ambiguous October 16, 2000 fee agreement against Swonke. The finding that Swonke complied with his fiduciary duty reinforces

our decision to forego reliance on *contra proferentem* and to refrain from automatically construing the ambiguous fee agreement against Swonke. The trial court properly left this issue to the jury's resolution.

## 2. Evidence supports the finding that Swonke contracted individually

■ We now turn to Anglo–Dutch's argument that legally and factually insufficient evidence supports the jury's finding that the fee agreement is between Anglo–Dutch and Swonke individually.

Question 1 asked and instructed the jury as follows:

Do you find that the Fee Agreement with Anglo–Dutch (Plaintiffs' Exhibit 1) was entered into on behalf of Greenberg Peden, or on behalf of Swonke, individually?

You must decide the agreement's meaning by determining the intent of the parties at the time of the agreement. Consider all the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties.

As to your two choices below, you must answer "YES" as to only one, and "NO" as to the other

Answer: NO on behalf of Greenberg Peden

YES on behalf of Swonke, individually

Anglo–Dutch argues that the evidence does not support the jury's answer to Question 1. As noted above, we will sustain no evidence challenges when the record discloses: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more

than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. Ultimately, our review will focus on whether the evidence would enable reasonable and fair-minded jurors to find that the fee agreement was entered on behalf of Swonke individually. *Id.* at 827.

Anglo–Dutch first contends that "[t]he only evidence offered at trial by Swonke in support of the alleged ambiguity amounts to no evidence." This argument appears to correspond to situation (b) identified above. Anglo–Dutch asserts that the use of personal pronouns in the fee agreement is no evidence because the fee agreement is unambiguous—an argument we already have rejected. Anglo–Dutch also contends that Van Dyke's deposition testimony in the Halliburton lawsuit, in which he stated that he had a fee contract with Swonke, does not support or create an ambiguity and thus constitutes no evidence because it related to a different topic—the number and rough identity of the fee contracts that Anglo–Dutch had at the time. We reject this contention because the jury was entitled to consider this testimony and its context; that context does not prevent reasonable and fair-minded jurors from relying upon it to answer "yes" as to Swonke in response to Question 1.

Anglo–Dutch next contends that the only competent evidence in the record conclusively shows that the fee agreement always was intended to be between Anglo–Dutch and Greenberg Peden. This argument corresponds to situation (d) set out above because it asserts that the evidence conclusively establishes the opposite of a vital fact.

Under this challenge, Anglo–Dutch asserts that the Assignment and Release Agreement obtained from Greenberg Peden on April 16, 2004 reveals the parties' true intent. That assignment and release says Swonke signed the fee agreement on behalf of the law firm; that the firm assigned any interest under the fee agreement to Swonke; and that the firm released Anglo–Dutch from liability to Greenberg Peden for fees under the fee agreement. Anglo–Dutch argues that Swonke would not have needed an assignment of rights if he believed he had an individual fee agreement with Anglo–Dutch and the rights already belonged to him. Anglo–Dutch contends that Greenberg Peden shareholder Skip Naylor acknowledged that the fee agreement was executed on behalf of the firm.

Anglo–Dutch also stresses that other contingency fee agreements Swonke signed in his individual capacity were printed on Swonke's own letterhead. It further argues that Swonke's outward appearance and behavior indicated he was employed by Greenberg Peden while working on Anglo–Dutch matters; this included his billing practices, recording time on the firm's system, using the firm's paralegals, and using the firm to bill Anglo–Dutch for expenses relating to the Halliburton lawsuit. Anglo–Dutch contends that its execution of a promissory note in favor of Greenberg Peden—and not Swonke individually—for the outstanding legal fees it owed confirms that Swonke worked on Anglo–Dutch matters through the firm and not individually. Additionally, Swonke's letter informing Anglo–Dutch of his move to McConn & Williams stated that his legal services had been provided "through [his] association with Greenberg Peden P.C."

Van Dyke further suggested in his testimony that Anglo–Dutch agreed to the rounding feature in the formula for calculating the fee only as a reward to Greenberg Peden for its forbearance on prior unpaid legal bills. He also pointed to the October 17, 2000 transmittal letter he sent

to Swonke, which he portrays as confirmation the parties intended the fee agreement to be between Anglo–Dutch and Greenberg Peden. Lastly, Anglo–Dutch contends that, after Swonke moved to McConn & Williams, he maintained every appearance of acting as a McConn & Williams attorney using the firm office space, letterhead, e-mail account and billing system. According to Anglo–Dutch, this gave Anglo–Dutch no reason to believe Swonke was employed individually under the terms of the October 16, 2000 fee agreement.

This evidence does not rise to the level of allowing "only one logical inference" in favor of a finding that Anglo–Dutch contracted with Greenberg Peden. *See City of Keller,* 168 S.W.3d at 822. Swonke's testimony provided contrary evidence and established that more than one inference was permissible in this case. The choice between these competing narratives belonged to the jury. We will not disturb that choice.

Swonke testified that the Assignment and Release Agreement was drafted only because of Van Dyke's "hypersensitivity" and concern that Greenberg Peden would attempt to assert a right to fees under the October 16, 2000 fee agreement. When Swonke told Van Dyke that he wanted to be included on the settlement distribution list, Van Dyke insisted that Swonke first obtain a release from Greenberg Peden because the fee agreement was on firm letterhead and Van Dyke was worried that the firm would make a claim against Anglo–Dutch. Swonke and Greenberg Peden shareholder Skip Naylor drafted a release and assignment to address Van Dyke's request. Swonke testified that he prepared a release and an assignment because an assignment had to occur before there could be a release, and Swonke and Naylor were trying to draft a document that

would give Van Dyke the comfort he sought. Swonke testified that the release implicitly required an assignment of rights to place Swonke and Anglo–Dutch in the position Van Dyke, Swonke and Greenberg Peden believed they should occupy. Naylor explained that the language in the document was there to assure Van Dyke that, when Anglo–Dutch paid Swonke, it would owe Greenberg Peden nothing.

Swonke's practice was to use his personal letterhead whenever he entered into an individual contingency fee agreement with a new client, and Anglo–Dutch was not a new client. Further, Swonke testified that Van Dyke knew he was "of counsel" to Greenberg Peden because he explained the meaning of his "of counsel" status to him on several occasions, including once while Van Dyke worked at his father's company in the late 1980s. Swonke's work as "of counsel" was billed through Greenberg Peden's billing system; under the fee sharing arrangement between Swonke and Greenberg Peden, the firm would deduct a certain percentage of the fees the clients paid to reimburse Greenberg Peden, among others, for using office space, paralegals, secretaries, and parking.

Swonke told Van Dyke he generated his own work, did not get a salary from the firm, and was paid only when the clients paid. Swonke told Van Dyke he was not part of the firm, despite appearances that Swonke had "all the trappings of the firm." Further, Naylor testified that sending Anglo–Dutch a bill for Halliburton lawsuit expenses was simply a mistake on Greenberg Peden's part.

Additionally, Swonke testified that Van Dyke proposed a contingency fee agreement. Although Swonke suggested his usual flat percentage fee, Van Dyke insisted on the formula stated in the fee agreement. Swonke initially rejected the formula because he thought it was too

complicated, but later acquiesced to it because Van Dyke thought this would be the only fair way to measure Swonke's hours. Swonke added a rounding feature because he knew Van Dyke had a propensity for "putting decimals out there to a long degree."

According to Swonke, Van Dyke absolutely and without a doubt knew that Swonke would be paid individually when he moved from Greenberg Peden to McConn & Williams. Swonke also sent Van Dyke a letter informing him of Swonke's move to McConn & Williams as "of counsel" and Swonke's intention to take Anglo–Dutch's files with him unless Anglo–Dutch objected.

Finally, Swonke testified that he did not see the October 17, 2000 transmittal letter because it transmitted the McConn & Williams contingency fee agreement, which Swonke already had in his file. Normally, Swonke would not read a letter that refers to a document he already had in his files. Swonke stated that he would have responded to the letter if he had thought Van Dyke was contending the fee agreement was not with Swonke individually.

From this evidence, the jury was entitled to conclude that Van Dyke knew the implications of Swonke's "of counsel" status at Greenberg Peden and McConn & Williams because Swonke had explained the meaning of his status before they signed the October 16, 2000 fee agreement. The jury also was entitled to conclude that executing the promissory note in favor of Greenberg Peden was consistent with the "of counsel" arrangement Swonke had with the firm.

The jury could conclude that the fee agreement's rounding feature was included to not as a reward for Greenberg Peden's forbearance, but as a means of addressing Van Dyke's propensity for "putting decimals out there to a long degree." The

jury could further conclude that Swonke never saw Van Dyke's October 17, 2000 transmittal letter until after the dispute arose. Finally, the jury was entitled to conclude that Swonke obtained the Assignment and Release Agreement only at Van Dyke's insistence to calm his fear that Greenberg Peden would assert an interest in the fee agreement, and that Swonke was willing to satisfy all of Van Dyke's demands to get paid under the fee agreement.

Therefore, the evidence does not conclusively establish that the parties always intended the fee agreement to be between Anglo–Dutch and Greenberg Peden; and Anglo–Dutch cannot assert a successful legal sufficiency challenge based on this argument.

Lastly, we conclude that Anglo–Dutch cannot prevail on a no evidence challenge described in situations (a) and (c) under Chief Justice Calvert's formulation applied above in *City of Keller*. The vital fact at issue here is whether the parties intended the fee agreement to be between Anglo–Dutch and Greenberg Peden, or between Anglo–Dutch and Swonke individually.

More than a scintilla of evidence supports the jury's answer to Question 1. This evidence includes consistent use of personal pronouns throughout the fee agreement against a backdrop of undisputed evidence that Van Dyke repeatedly was told Greenberg Peden would not represent Anglo–Dutch due to unpaid legal bills. These circumstances give the choice of personal pronouns added significance, and the jury was entitled to consider these circumstances.

This evidence also includes Van Dyke's 2002 deposition testimony in the Halliburton lawsuit. Van Dyke testified that Anglo–Dutch had two contingency fee contracts: one with John O'Quinn, Jett

Williams, and Luke McConn, and the other with Swonke. Van Dyke did not mention Greenberg Peden in his deposition testimony. Van Dyke's deposition testimony reasonably can be read to conflict with his trial testimony; deciding the credibility of witnesses and the weight to be given to conflicting testimony is left to the jury's discretion. *See City of Keller*, 168 S.W.3d at 819. There is more than a scintilla of evidence to support the jury's finding that Anglo–Dutch contracted with Swonke individually when it agreed to pay attorney's fees and Swonke agreed to work on the Halliburton lawsuit.

Further, on the record before us, Anglo–Dutch cannot show a complete absence of evidence establishing the vital fact that Anglo–Dutch and Swonke intended to contract for payment of Swonke's individual services rather than the services of Greenberg Peden. Evidence establishing this vital fact constitutes much more than a scintilla and includes the following.

In 1999 or early 2000, Swonke and David Peden had a meeting with Van Dyke at which Peden expressly told Van Dyke that Greenberg Peden no longer would perform legal work for Anglo–Dutch due to unpaid legal bills. No one at Greenberg Peden had performed legal work for Anglo–Dutch since 1999.

In February or March of 2000, Greenberg declined to represent Anglo–Dutch in the Halliburton lawsuit on an hourly and contingency fee basis due to the unpaid bills. Van Dyke admitted that Swonke informed him of Greenberg Peden's refusal. Swonke testified that, after Anglo–Dutch signed a contract with McConn & Williams, he did not want to be involved with the Halliburton lawsuit but Van Dyke and McConn & Williams attorneys continued to call him for advice and help.

When Swonke became weary of providing legal services without compensation,

Van Dyke called him and asked for his personal services. Swonke testified that Van Dyke knew no one at Greenberg Peden would help him, and that Van Dyke intended to hire Swonke individually. Van Dyke proposed the fee agreement and the parties negotiated the terms. Swonke also testified that the use of firm letterhead and signature block made no difference because he, Van Dyke and Greenberg Peden all knew that Anglo–Dutch was contracting with Swonke individually.

Swonke consistently maintained that he was working for Anglo–Dutch individually and consistently demanded payment for his legal work on that basis. This was also evident from Swonke's e-mails and other written correspondence with Van Dyke and others after the Halliburton lawsuit was settled. Swonke testified that, before the meeting on April 24, 2002, Van Dyke never mentioned that he thought the fee agreement was with Greenberg Peden.

In addition to this testimony from Swonke, there is other evidence the jury could have relied upon in determining the parties' intent.

Naylor and Peden both testified that the fee agreement was between Anglo–Dutch and Swonke individually. Naylor stated that the Greenberg Peden letterhead does not determine the identity of parties to the fee agreement because the firm had refused to be involved in the Halliburton lawsuit and Van Dyke knew that; therefore, the fee agreement described how Swonke individually would assist Anglo–Dutch in the Halliburton lawsuit and not how the firm would assist Anglo–Dutch. Naylor reiterated that, despite the use of firm letterhead, Van Dyke knew the firm would not represent Anglo–Dutch and Swonke would do so.

The jury also heard testimony from Nancy Strong, a McConn & Williams at-

torney, who worked on the Halliburton lawsuit. She testified that she became aware that Anglo–Dutch resisted paying Swonke because Van Dyke was not taking Swonke's calls or calling him back after having talked to him on a daily basis for years. She told Swonke that Van Dyke would try to renegotiate his contract and pay less than what he bargained for as he had done with all the other people he dealt with, including McConn & Williams in a previous matter and the Anglo–Dutch investors.

Based on our review of the record, we conclude that the evidence in this case is legally sufficient because it would enable reasonable and fair-minded jurors to find that Anglo–Dutch contracted with Swonke individually. *See City of Keller*, 168 S.W.3d at 827. The evidence also is factually sufficient to support the jury's answer to Question 1. After considering and weighing all the evidence, we conclude that the evidence is not so weak and the finding that the parties intended the fee agreement to be between Anglo–Dutch and Swonke individually is not so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.

We overrule Anglo–Dutch's second and fifth issues.

## C. Jury Instructions

In its third issue, Anglo–Dutch seeks reversal and a new trial on grounds that the trial court erroneously refused Anglo–Dutch's requests for additional instructions to accompany Question 1. Anglo–Dutch contends that the trial court should have submitted additional instructions applicable to Question 1 identifying the relevant fiduciary duties an attorney owes to a client, along with "a generally applicable instruction on the 'presumption of unfairness' that automatically arises when an attorney contracts with an existing client."

Anglo–Dutch asked the trial court to include "general" instructions applicable to Questions 1, 2, and 3. This cluster of questions pertained to the identity of the contracting parties, failure to comply with the fee agreement, and contract damages. Anglo–Dutch requested the following "general" instructions:

You are instructed that a law firm and its lawyers, including any "Of Counsel" lawyers who provide services for clients of that firm, owe a fiduciary duty to the client. A lawyer who works as an "Of Counsel" to a law firm is treated under the law as an employee of that firm.

A lawyer owes a fiduciary duty to a client and must act with integrity and fidelity and in the best interest of his client. Some of the fiduciary duties a lawyer owes his client include the:

1. duty to be strictly and perfectly honest about fee arrangements and to refrain from self-dealing;

2. duty to act with absolute candor, openness, honesty, and without any concealment or deception;

3. duty to represent the client with undivided loyalty, keeping the client's best interest in mind;

4. duty to inform the client of matters material to representation;

5. duty to provide the client at the outset with a clear and accurate explanation of the basis or rate of the fee to be charged under the fee agreement and how it is to be calculated;

6. duty to timely inform the client of a conflict of interest.

You are further instructed that, with regard to the fee agreement in question, it is the attorney's and law firm's burden to provide that the attorney and law firm acted with perfect fairness, adequa-

cy, and equity with regard to the client. Where self-dealing on the part of the attorney and/or the law firm is alleged by the client, a presumption of unfairness automatically arises and it is the attorney's and law firm's burden to prove (a) that the questioned transaction was made in good faith, (b) for a fair consideration, and (c) after full and complete disclosure of all material information to the client.

You are further instructed that attorneys, law firms, and attorneys performing services as "Of Counsel" to a law firm have a duty, at the beginning of representation of a client on a contingency fee matter, to inform that client of the basis or rate of the contingency fee. Also, the attorney must inform the client about the implication of a contingency fee agreement.

Anglo–Dutch also asked the trial court include the following instructions as part of Question 1:

In answering this question, you are instructed that the agreement must be construed as a reasonable person in the circumstances of the client would have construed it.

You are further instructed that the obligation of clarifying attorney-client contracts falls on the attorney because of the attorney's greater knowledge and experience with respect to fee arrangements and because of the trust the client has placed in the attorney.

The trial court refused Anglo–Dutch's requests.

■ Because a trial court enjoys wide discretion in determining which instructions should be included in the jury charge, our review is limited to determining whether the court acted without reference to any guiding rules or principles. *See Tex. A & M Univ. v. Chambers,* 31 S.W.3d 780, 783 (Tex.App.-Austin 2000,

pet. denied). A trial court's asserted error in refusing an instruction is reversible only if it probably caused the rendition of an improper judgment. Tex.R.App. P. 44.1; *Dew,* 208 S.W.3d at 456.

■ We conclude that the trial court acted within its discretion when it refused Anglo–Dutch's requested additional instructions. Further, any asserted error in refusing the requested instructions was harmless.

■ With respect to the construction placed upon the fee agreement by a reasonable person in the client's circumstances, Question 1 already included a broad instruction that told the jury to "[c]onsider all of the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties." The existing instruction encompassed the client's perspective of the fee agreement, and the trial court was not obligated to provide further instructions tailored to a particular litigant's liking. Similarly, the trial court acted within its discretion by rejecting the requested instruction pertaining to treatment of an "of counsel" attorney as a firm employee. Even assuming for argument's sake that this is a correct statement of the law, not every correct statement of the law belongs in the jury charge. A requested instruction can set forth a correct statement of the law and still be unnecessary in the charge. *See Acord v. General Motors Corp.,* 669 S.W.2d 111, 116 (Tex.1984); *Maddox v. Denka Chem. Corp.,* 930 S.W.2d 668, 671 (Tex.App.-Houston [1st Dist.] 1996, no writ). The trial court acted within its discretion when it refused to include this unnecessary additional statement.

The remaining requested instructions pertain to Swonke's fiduciary duty. An-

glo–Dutch's request to include "general" fiduciary duty instructions applicable to Question 1 is another manifestation of Anglo–Dutch's larger effort to link the contract interpretation issue with its contention that Swonke breached his fiduciary duties.

We already have concluded that Swonke's asserted breach of his fiduciary duty does not influence the manner in which the fee agreement is interpreted in this case. The trial court submitted a separate fiduciary duty question and accompanying instructions describing the facets of that duty in Question 5. The jury answered "yes" to Question 5, which (a) asked whether Swonke complied with his fiduciary duty to Anglo–Dutch, and (b) placed the burden on Swonke to justify his conduct and establish his compliance with his fiduciary duty. Legally and factually sufficient evidence supports the jury's "yes" answer to Question 5. The instructions accompanying Question 5 describe the fiduciary duty that Anglo–Dutch sought to apply to Question 1 via its requested instructions. The trial court acted within its discretion in submitting fiduciary duty instructions as part of Question 5, and in refusing to submit another set of fiduciary duty instructions applicable to Question 1.

In any event, the asserted charge error in refusing to include fiduciary duty instructions applicable to Question 1 was harmless because fiduciary duty instructions were submitted as part of a separate question that the jury answered adversely to Anglo–Dutch. *See Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 214 (Tex.App.-Houston [14th Dist.] 1991, no writ) (omission of requested instructions was harmless in light of separate question that applied requested legal stan-

dard and was answered adversely to party seeking the instructions).

We overrule Anglo–Dutch's third issue.

## D. Admission of Evidence

In its fourth issue, Anglo–Dutch asserts that a new trial is required because the trial court erroneously admitted evidence regarding other litigation involving Anglo–Dutch. Specifically, Anglo–Dutch challenges the trial court's admission of evidence relating to (1) "investor lawsuits," "lawsuit funding agreements," or "Anglo–Dutch's payment, nonpayment, or attempts at resolving any claims related thereto;" (2) investor Michael Lore's testimony; and (3) any unpaid fees to McConn & Williams or any other law firm.

Because we review a trial court's admission of evidence for abuse of discretion, *In re J.P.B.,* 180 S.W.3d at 575, we must uphold the evidentiary ruling if there is any legitimate basis in the record to support it. *Owens–Corning Fiberglas Corp.,* 972 S.W.2d at 43. We will not reverse a trial court for an erroneous evidentiary ruling unless the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex.R.App. P. 44.1; *see also Gee,* 765 S.W.2d at 396.

We conclude that the trial court acted within its discretion in admitting the challenged evidence. A key issue at trial focused on the parties' intent in signing the fee agreement in light of the surrounding facts and circumstances. Those facts and circumstances included the challenged evidence, which related in significant part to the parties' sophistication and intent. We cannot say that the trial court abused its discretion in admitting evidence relating to the lawsuit funding agreements and investor lawsuits, or investor Michael Lore's testimony.

Additionally, any error in admitting the challenged evidence was harmless because it was introduced at different stages of the trial without objection by Anglo–Dutch. *See Volkswagen of Am., Inc. v. Ramirez,* 159 S.W.3d 897, 907 (Tex.2004) (error in admission is deemed harmless if the objecting party permits the same or similar evidence to be introduced without objection).

The trial court admitted evidence that Anglo–Dutch had entered into lawsuit funding agreements with investors to offset Anglo–Dutch's expenses during prosecution of the Halliburton lawsuit. The trial court reasoned that this evidence tended to show Swonke's individual legal work with respect to Anglo–Dutch's investors. Evidence regarding these same lawsuit funding agreements was later admitted by the trial court without objection when Van Dyke testified that he instructed Swonke to draft releases for investors to encourage them to take less than they agreed to in their lawsuit funding agreements so that the Halliburton lawsuit could be settled. Van Dyke also testified without objection that he did not pay any of the 33 investors the amounts contracted for in the funding agreements. Further, the trial court admitted evidence that investors in the Halliburton lawsuit had sued Anglo–Dutch because it did not pay them the amounts for which they had contracted. Without objection, the jury was later again informed of these investor lawsuits.

With respect to Michael Lore's testimony, the trial court found that it was admissible for the limited purpose of stating that he was an investor; of impeaching Van Dyke's testimony in which he claimed the investors were happy with the payment they had received from Anglo–Dutch; and in rebuttal to McConn's assertion that Van Dyke was a fine man. Lore testified that he was displeased when Van Dyke asked him to accept less than he contracted for; that he didn't sign the release Van Dyke requested; that he was never told the Halliburton settlement amount by Van Dyke; that he sued Anglo–Dutch to recover the amount originally contracted for; that and he did not think Van Dyke was a fine man. Only during cross-examination by Anglo–Dutch's attorney did Lore answer more particular questions regarding his investor lawsuit.

Nancy Strong testified without objection that a dispute arose between Van Dyke and McConn & Williams because he failed to pay the entire legal bill after the firm had successfully represented Van Dyke in an unrelated lawsuit against OPIC, one of Anglo–Dutch's Tenge Field project partners. Strong also testified that Van Dyke owed the law firm of Looper Reed legal fees for its work in the lawsuit against OPIC.[6] Swonke testified without objection that Van Dyke could not hire the Looper Reed law firm to represent Anglo–Dutch in the Halliburton lawsuit because "as it turn[ed] out, he owed Looper Reed quite a bit of money, too."

Finally, Anglo–Dutch has not established on this record that the verdict turned on the challenged evidence. *See City of Brownsville,* 897 S.W.2d at 753–54. This trial was in significant part a credibility battle based on the jury's assessment of Swonke and Van Dyke. Both testified at length. Anglo–Dutch has not demonstrated that the admission of evidence regarding collateral agreements and disputes during a lengthy trial featuring voluminous evidence likely caused the rendition of an improper judgment.

We overrule Anglo–Dutch's fourth issue.

**6.** Anglo–Dutch objected to this testimony only on hearsay grounds.

## Conclusion

We hold that the October 16, 2000 fee agreement was ambiguous with respect to whether Anglo–Dutch contracted with Swonke individually or with Greenberg Peden. The trial court properly refused to construe the ambiguous fee agreement against Swonke and properly submitted this issue to the jury. Legally and factually sufficient evidence supports the jury's finding that Swonke individually is a party to the fee agreement with Anglo–Dutch, and that Greenberg Peden is not. Legally and factually sufficient evidence supports the jury's finding that Swonke complied with his fiduciary duty to Anglo–Dutch. Anglo–Dutch's charge and evidentiary complaints provide no basis for reversal.

We affirm the trial court's judgment.